# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JUBA MOHAMMED ALI,<br><br>　　　　　Petitioner,<br><br>vs.<br><br>WARDEN ROCHELLE MOORE,<br><br>　　　　　Respondent. | CASE NO. 5:23-CV-02332<br><br>JUDGE CHRISTOPHER A. BOYKO<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Petitioner Juba Mohammed Ali ("Mr. Ali" or "Petitioner") filed the pending habeas corpus petition under 28 U.S.C. § 2254, asserting one ground for relief that challenges his convictions and aggregate prison term of eighteen years to life in Summit County Court of Common Pleas, Case No. CR-2019-04-1328, for rape, kidnapping, and gross sexual imposition.[1] (ECF Doc. 1 ("Petition"); ECF Doc. 7-1, p. 38.)

The matter was assigned to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  The case is briefed and ripe for disposition.  (ECF Docs. 7 & 9.)  For the reasons set forth herein, the undersigned recommends that the Court **DISMISS** and/or **DENY** Ground One.

## I.　　Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a

---

[1]  The Petition was docketed on December 7, 2023.  (ECF Doc. 1.)  "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)).  However, Mr. Ali does not state when he placed the Petition in the prison mailing system.  (ECF Doc. 1, p. 15.)

1

State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Ninth District Court of Appeals summarized the facts underlying Mr. Ali's convictions and sentence as follows:

> {¶2} In April 2019, an indictment was filed charging Ali with one count of rape and one count of gross sexual imposition. In June 2019, a supplement to the indictment was filed adding a charge of kidnapping. That same day, a second supplement was filed adding counts four, five, and six: rape, with a sexually violent predator specification, kidnapping, with a sexual motivation specification, and gross sexual imposition. All of the counts related to the events of November 23, 2018, when it was alleged that Ali sexually assaulted his then 16-year-old great niece, S.B.

> {¶3} In July 2019, the State filed a notice of its intent to use other acts evidence in support of its case. The State sought to present the testimony of two women who claimed to have been previously assaulted by Ali. The State maintained that the prior incidents would be probative of Ali's motive, common scheme or plan, pattern, or modus operandi. Ali objected to the use of the evidence and requested an evidentiary hearing. A hearing was held on the motion. The trial court ultimately concluded that the testimony was admissible for purposes of establishing a common scheme, plan, motive, intent and/or absence of mistake.

> {¶4} The matter proceeded to a trial at which the other acts evidence was presented. Prior to the start of the trial, the State moved to dismiss counts one through three and only proceeded on the remaining counts, which were renumbered. Ali elected to have the sexually violent predator specification tried to the trial judge.

> {¶5} The jury found Ali guilty of all counts and the trial court found Ali to be a sexually violent predator . . .

*State v. Ali*, 2021-Ohio-4596, ¶¶ 2-5, 2021 WL 6143764, at *1 (Ohio Ct. App. Dec. 30, 2021); (ECF Doc. 7-1, pp. 140-41.)

## II.     Procedural Background

### A.     State Court Conviction

On April 25, 2019, a Summit County Grand Jury indicted Mr. Ali on one count of rape (Count 1) and one count of gross sexual imposition (Count 2). (ECF Doc. 7-1, pp. 5-6.) Mr. Ali

appeared for his arraignment on April 26, 2019, with counsel and entered a plea of not guilty on both counts. (*Id*. at pp. 7-8.) On June 3, 2019, the Summit County Grand Jury indicated Mr. Ali on the following additional counts: one count of kidnapping (Count 3), one count of rape (Count 4) with a sexually violent predator specification, one count of kidnapping (Count 5) with sexual motivation specification, and one count of gross sexual imposition (Count 6). (*Id*. at pp. 9-12.) On June 11, 2019, Mr. Ali appeared with counsel for his arraignment on the supplemental indictments and pled not guilty to each of the additional counts. (*Id*. at p. 13.)

On July 9, 2019, the State filed a notice of intent to use other acts evidence, seeking "to admit evidence and/ or testimony of Defendant[']s acts from two prior incidents for displaying motive, common scheme or plan, pattern, and modus operandi in the present case." (*Id*. at pp. 14-17.) Mr. Ali filed an opposition and requested a hearing. (*Id*. at pp. 18-21.) The court held a hearing on the matter on July 25, 2019, and recessed until August 14, 2019, at which time the court took the State's motion under advisement and set a briefing schedule. (*Id*. at pp. 22, 28.) Defendant did not file a brief. (*Id*. at p. 28.) On September 23, 2019, the State filed a brief. (*Id*. at pp. 23-27.) On October 2, 2019, the court found the State's notice of intent to use other acts evidence well-taken and granted its request to use the other acts evidence. (*Id*. at pp. 28-29.) The court explained that the State was "offering to introduce testimony of individuals who were prior victims of Defendant in two cases from the 1990's" and found that:

> the testimony provided during the hearing establishe[d] that there are similarities between the allegations in the present case and the facts of the earlier convictions [to] demonstrate a permissible purpose for admission of the testimony to prove a common scheme, plan, motive, intent and/or absence of mistake.

(*Id*. at p. 29.)

On October 16, 2019, Mr. Ali waived his right to jury on the sexually violent predator specification (*id.* at p. 30) and the case proceeded to a jury trial on Count 4 (rape, renumbered

3

Count 1), Count 5 (kidnapping, renumbered Count 2)[2] & Count 6 (gross sexual imposition, renumbered Count 3) (*id*. at p. 35).[3]  On October 22, 2019, the jury reached its verdict, finding Mr. Ali guilty on all three counts and the sexual motivation specification.  (*Id*. at pp. 31-35.)  On December 6, 2019, the court found Mr. Ali to be a sexually violent predator.  (*Id*. 37-40.)  The court sentenced him to an aggregate prison sentence of 18 years to life; Count 3 was merged with Count 1 for purposes of sentencing and the sentences on Counts 1 & 2 were ordered to be served consecutively with each other.  (*Id*.)

**B.      State Petition for Habeas Corpus**

On October 31, 2019, prior to his sentencing, Mr. Ali filed a pro se petition for habeas corpus with the Ninth District Court of Appeals arguing that his speedy trial rights were violated and the trial court was aware of the violation at the time of his trial.  (ECF Doc. 7-1, pp. 43-44.)  He filed a supplement to the petition on November 7, 2019, asserting that the State had two "inexcusable delays" in violation of his speedy trial rights.  (*Id*. at pp. 45-46.)  On November 20, 2019, the Ohio Court of Appeals dismissed the case due to numerous defects.  (*Id*. at pp. 47-49.)

**C.      Direct Appeal**

On December 9, 2019, Mr. Ali filed a notice of appeal with the Ninth District Court of Appeals through new appointed counsel.  (ECF Doc. 7-1, p. 50.)  In his appellate brief (*id.* at pp. 51-88), he raised the following assignment of error:

> 1.      The trial court committed reversible error by admitting into evidence other acts evidence in violation of Evid. R. 403 and 404(B), and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, Sections 10 and 16 of the Ohio Constitution.

---

[2] The kidnapping count carried with it a sexual motivation specification.  (ECF Doc. 7-1, p. 35.)

[3] Originally numbered Counts 1, 2 & 3 were dismissed upon motion of the State and Counts 4, 5 & 6 were renumbered as Counts 1, 2 & 3.  (ECF Doc. 7-1, p. 35.)

(*id*. at pp. 55-84).  The State of Ohio filed its appellate brief (*id.* at pp. 89-126) and Mr. Ali filed

a reply brief (*id.* at pp. 127-39).  On December 30, 2021, the Ninth District Court of Appeals

affirmed the judgment of the trial court.  (*Id.* at pp. 140-69.)

On January 28, 2022, Mr. Ali filed a pro se notice of appeal with the Supreme Court of

Ohio (*id.* at pp. 170-71) and memorandum in support of jurisdiction (*id.* at pp. 172-219).  He

raised the following proposition of law:

> 1.    The trial court committed reversible error by admitting into evidence other
>       acts evidence in violation of Evid. R. 403 and 404(B), and the Fifth, Sixth,
>       and Fourteenth Amendments to the United States Constitution and Article
>       1, Sections 10 and 16 of the Ohio Constitution.

(*Id*. at pp. 177-86.)  On February 14, 2022, the office of the Ohio Public Defender filed an

amicus curiae memorandum in support of jurisdiction (*id.* at pp. 220-30), providing the following

restatement of Defendant-Appellant's proposition of law:

> When reviewing the improper admission of other-acts evidence for harmless error,
> a reviewing court must apply the standard outlined in *State v. Tench*, 156 Ohio St.3d
> 85, 2018-Ohio-5205, 123 N.E.3d 955.

(*id.* at p. 221.)  The Ohio Public Defender argued that Ohio courts of appeal were applying "two

different standards to determine whether improperly admitted other acts evidence [was] harmless

error" and asserted that its office had an interest in Mr. Ali's case because it was "about

providing a consistent harmless error standard in cases where courts have erroneously admitted

harmful other-acts evidence under Evidence Rule 404(B)."  (*Id*. at pp. 222-23.)  The State filed a

Memorandum in Opposition on February 28, 2022.  (*Id*. at pp. 231-40.)  The Supreme Court of

Ohio accepted the appeal, ordered briefing, and appointed the Office of the Ohio Public

Defender to represent Mr. Ali.  (*Id*. at p. 241.)  On July 5, 2022, Mr. Ali filed a merit brief

through appointed counsel.  (*Id*. at pp. 242-97.)  The Ohio Association of Criminal Defense

Lawyers also filed an amicus curiae brief in support of Mr. Ali on July 5, 2022.  (*Id*. at pp. 298-

310.)  The State filed its merit brief on August 4, 2022 (*id.* at pp. 311-54) and Mr. Ali filed a reply brief on August 24, 2022 (*id.* at pp. 355-67.)  On March 8, 2023, the Supreme Court of Ohio dismissed the appeal as having been improvidently granted.  (*Id*. at p. 368.)

**D.      Ohio App. R. 26(B) Application to Reopen Appeal**

On February 10, 2022, while his direct appeal was pending, Mr. Ali filed a pro se motion seeking to reopen his appeal pursuant to App. R. 26(B) in the Ninth District Court of Appeals. (ECF Doc. 7-1, pp. 369-80.)  He argued appellate counsel was ineffective due to failure to argue on appeal that his indictment was defective under Crim. R. 6(C) and (F), R.C. 2939.20, and the Fifth and Fourteenth Amendments.  (*Id*. at p. 371.)  On February 17, 2022, the Ninth District Court of Appeals denied Mr. Ali's application for reopening because it did "not contain a sworn statement of the basis for his application as required by App. R. 26(B)(2)(d)."  (*Id*. at p. 381.)

**E.      Federal Habeas Corpus Petition**

Mr. Ali raises one ground for relief in his Petition:

**Ground One:**  Error in admitting into evidence other acts evidence in violation of Evid. R. 403 and 404(B).

**Supporting Facts:** The trial court committed reversible error by admitting into evidence other-acts evidence in violation of Evid. R. 403 and 404(B), and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article 1, Section 10 and 16 of the Ohio Constitution.

(ECF Doc. 1, pp. 5; ECF Doc. 1-1, pp. 2-13.)

### III.    Law & Analysis

**A.      Standard of Review Under AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214 ("AEDPA") limits the adjudication of federal habeas petitions in which state prisoners have collaterally attacked their convictions.  *See Reed v. May*, 134 F.4th 455, 459 (6th

6

Cir.), *cert. denied sub nom. Reed v. Fredrick*, 146 S. Ct. 226, 223 L. Ed. 2d 78 (2025); *see also*

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets

several limits on the power of a federal court to grant an application for a writ of habeas corpus

on behalf of a state prisoner.").  Under 28 U.S.C. § 2254, as amended by AEDPA, federal courts

may "entertain only those applications alleging that a person is in state custody 'in violation of

the Constitution or laws or treaties of the United States'" and in most instances, federal courts

may not grant habeas relief "unless . . . the applicant has exhausted state remedies."  *Cullen*, 563

U.S. at 181 (citing 28 U.S.C. §§ 2254(a), (b), (c)).

"AEDPA's 're-litigation bar' applies when a state court denies a prisoner's claim on the

merits, rather than denying it for procedural reasons."  *Reed*, 134 F.4th at 459 (citing 28 U.S.C. §

2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011)).  Under the "re-litigation bar," when a

federal habeas application involves a claim that was "adjudicated on the merits in State court

proceedings," the application "shall not be granted" unless the State court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington*, 562 U.S. at 100.  The burden of

proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

The Sixth Circuit has explained that "AEDPA authorizes a federal court to grant a writ of

habeas corpus for state prisoners only to guard against 'extreme malfunctions in the state

criminal justice systems.'"  *Hodge v. Plappert*, 136 F.4th 648, 657 (6th Cir. 2025), *cert. denied*,

No. 25-6179, 2026 WL 79639 (U.S. Jan. 12, 2026) (quoting *Shinn v. Ramirez*, 596 U.S. 366, 377

(2022)).  This is because "Congress recognized that '[f]ederal habeas review of state convictions

frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Hodge*, 136 F.4th at 657–58 (quoting *Harrington*, 562 U.S. at 103 (brackets in original).  "Congress designed 28 U.S.C. § 2254(d) to remind federal courts that 'state courts are the principal forum for asserting constitutional challenges to state convictions.'" *Hodge*, 136 F.4th at 658 (quoting *Harrington*, 562 U.S. at 103).

**B.      Sole Ground for Relief**

In his sole ground for relief, Petitioner argues that the trial court's admission of "other acts" evidence—here, testimony from two women saying they were assaulted by Petitioner over 20 years before the alleged assault that was before the trial court—violated Ohio rules of evidence and his state and federal constitutional rights.  (ECF Doc. 1, p. 5; ECF Doc. 1-1, pp. 2-13.)  Specifically, he asserts that the state court rulings were "unreasonable" and "contrary" to the Supreme Court's interpretation of federal law, including the Court's holding "that a jury's knowledge of a defendant's past criminal conduct is prejudicial and denies him a 'fair' opportunity to defend against a particular charge."  (ECF Doc. 1-1, pp. 2-4 (citing *Michelson v. U.S.*, 335 U.S. 469 (1948)).)  In further support, Petitioner attaches the dissenting opinion from his direct appeal proceedings before the state court of appeals.  (ECF Doc. 1-1, pp. 4-13.)

In response, Respondent argues first that Petitioner's sole ground for relief is not cognizable on federal habeas review because Petitioner did not identify a Supreme Court case establishing a due process right as to the kind of evidence at issue in this case.  (ECF Doc. 7, pp. 9-10 (citing *Steward v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020)).)  Second, Respondent argues that the Petition should be denied on its merits because Petitioner has not met his burden to show that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict."  (*Id.* at pp. 32-35 (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).)

8

1.      **Federal Habeas Relief Based on State Law Evidentiary Rulings**

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Issac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

That means a "state appellate court's interpretation of its own law and evidentiary rules, 'including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Chambers v. Artis*, No. 22-1247, 2022 WL 18542503, at *2 (6th Cir. Nov. 3, 2022), *cert. denied,* 143 S. Ct. 993 (2023) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)); *see also Small v. Brigano,* No. 04-3328, 134 F. App'x 931, 936 (6th Cir. 2005) ("We must presume that the Ohio Court of Appeals correctly interpreted Ohio evidence law[.]").  In other words, "[i]n general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review."  *Moreland v. Bradshaw,* 699 F.3d 908, 923 (6th Cir. 2012).

Nevertheless, "when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'"  *Andrew v. White*, 604 U.S. 86, 88 (2025) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citation omitted); *see also Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) ("Generally, state-court evidentiary rulings cannot rise to the level of due process violations

9

unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (bracket in original)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (explaining it is only "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, [that] it may violate due process and thus warrant habeas relief").

**2.      Ground One is Non-Cognizable to the Extent it Seeks Relief for Alleged Violations of the Ohio Rules of Evidence or the Ohio Constitution**

In Ground One of the Petition, Mr. Ali alleges "error in admitting into evidence other acts evidence in violation of [Ohio] Evid. R. 403 and 404(B)," but expands on this allegation in the associated supporting facts section by asserting:

> The trial court committed reversible error by admit-ting into evidence other acts evidence in violation of Evid. R. 403 and 404(B), and the Fifth, Sixth, and Four-teenth Amendments to the United States Constitution, and Article 1, section 10 and 16 of the Ohio Constitution.

(ECF Doc. 1, p. 5 (hyphens in original).)  To the extent Mr. Ali seeks relief because the trial court's admission of "other acts" evidence was contrary to state rules of evidence or the Ohio constitution, he has failed to state a cognizable claim upon which federal habeas relief may be granted.  *See Moreland*, 699 F.3d at 923 ("In general, alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review."); *see also Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Accordingly, the undersigned recommends that the Court **DISMISS** Ground One as not cognizable to the extent the challenge rests on alleged violations of state law.

Respondent also argues more broadly that the entirety of Ground One is non-cognizable on federal habeas review based on Sixth Circuit precedent holding that: (1) a petitioner seeking habeas relief regarding an evidentiary ruling must identify "'a Supreme Court case establishing a due process right with regard to [the] *specific kind of evidence*' at issue"; and (2) "'no clearly

10

established Supreme Court precedent . . . holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.'"  (ECF Doc. 7, pp. 9-10 (citing *Steward*, 967 F.3d at 538 (quoting *Moreland*, 699 F.3d at 923 and *Bugh*, 329 F.3d at 512-13) (emphasis in original)).)  But a recent Supreme Court decision precludes a finding that no clearly established Supreme Court precedent is applicable here.

In *Andrew v. White*, the Supreme Court vacated and remanded a Tenth Circuit decision denying federal habeas relief based on the lack of Supreme Court precedent "establish[ing] a general rule that the erroneous admission of prejudicial evidence could violate due process."  604 U.S. at 87-88; *see id.* at 91.  The Court explained "[t]hat was wrong" because its decision in *Payne v. Tennessee*, 501 U.S. 808 (1991) "made clear that when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'"  *Id.* at p. 88 (quoting *Payne*, 501 U.S. at 825).  The Court rejected any possible finding that AEDPA limited the holding in *Payne* to its facts, explaining: "General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court."  *Id.* at 94.  Given that the law that was "clearly established" in *Payne*, the Court instructed the lower courts to consider the merits of the due process claim on remand and specifically address the ultimate question: "whether a fairminded jurist could disagree that the evidence 'so infected the trial with unfairness' as to render the resulting conviction or sentence 'a denial of due process.'"  *Id.* at 95-96.

Since Ground One includes a federal constitutional challenge to the "prejudicial" admission of "other acts evidence" at Mr. Ali's criminal trial (*see* ECF Doc. 1-1, pp. 2-3), the undersigned concludes that there is clearly established U.S. Supreme Court precedent sufficient to require consideration of the merits of Petitioner's due process claim.  *See Andrew*, 604 U.S. at

11

87-88; *see also Ellis v. Jeffreys*, No. 8:23CV315, 2026 WL 123276, at *13 (D. Neb. Jan. 9, 2026) (rejecting argument that there is no clearly established Supreme Court precedent holding that the admission of other acts or propensity evidence violates due process, citing *Andrew*, 604 U.S. 86). Accordingly, Respondent's argument that the due process claim is non-cognizable must fail.

### 3.       The Due Process Claim in Ground One Should be Denied on its Merits

Having found that clearly established federal law governs the due process claim in Ground One, this Court must next determine whether the state court's denial of relief in this case was "contrary to" or an "unreasonable application" of that Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  To unreasonably apply the legal principles from *Andrew* and *Payne*, the state court's decision "must be 'so obviously wrong that its error lies "beyond any possibility for fairminded disagreement."'"  *Hodge*, 136 F.4th at 661 (quoting *Shinn v. Kayer*, 592 U.S. 111, 124 (2020) (per curiam) (citation omitted)).  In other words, since "clearly established law provided that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair," the question before this Court is "whether a fairminded jurist could disagree that the evidence 'so infected the trial with unfairness' as to render the resulting conviction . . . 'a denial of due process.'"  *Andrew*, 604 U.S. at 96.

Further, because the decision of the state court of appeals was based on a finding of "harmless error" this Court may only grant federal habeas relief if it finds that Petitioner has met both the AEDPA standard articulated above and the prejudice standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  In *Brecht*, the Supreme Court held that "a state prisoner should not receive federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict."  *Brown v. Davenport*, 596 U.S. 118, 133 (2022) (quoting *Brecht*, 507 U.S. at 637).  More recently, in *Brown v. Davenport*, the

12

Supreme Court addressed the question whether "[a]fter a state court determines that an error at trial did not prejudice a criminal defendant," a federal court may "grant habeas relief based solely on its independent assessment of the error's prejudicial effect" under *Brecht*, or must "also evaluate the state court's decision under" AEDPA, and held: "When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." 596 U.S. at 122. Thus, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either . . . [*Brecht*] or AEDPA," but "must find that the petitioner has cleared both tests" before it may "*grant* relief." *Id.* at 133 (italics in original).

The undersigned will therefore outline the relevant findings of the state court of appeals before considering whether Petitioner has shown both: (1) under AEDPA, that no fairminded jurist could disagree that the "other acts" evidence so infected Petitioner's trial with unfairness as to render his conviction a denial of due process; and (2) under *Brecht*, that the admission of the evidence had a "substantial and injurious effect or influence" on the verdict. The question under the first standard is whether "*every* fairminded jurist would agree that an error was prejudicial," while the question under the second standard is "whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown*, 596 U.S. at 136 (emphasis in original).

### i. State Appellate Court Adjudication of Petitioner's Direct Appeal Challenging the Admission of "Other Acts" Evidence at Trial

The court of appeals considered, but ultimately overruled, Mr. Ali's assignment of error relating to the admission of "other acts" evidence. *See Ali*, 2021 WL 6143764, at *1-9; (*see also* ECF Doc. 7-1, pp. 141-59.) In doing so, the court began by recounting the testimony presented by the State at the pretrial hearing to determine the admissibility of the "other acts" evidence, including testimony from three witnesses, A.B., D.S., and Detective Jerry Gachett, as follows:

{¶12} A.B. testified that in July 1994, when she was approximately 15 or 16 years old, Ali, who was a friend of someone she knew, asked if she would model some clothes for him. Ali drove her to a house and gave her clothes to try on. Ali did take photos but also started making inappropriate advances and touching her over her clothing. A.B. demanded that Ali take her home. Ali reluctantly agreed to do so. As they were driving, Ali was trying to touch A.B. Then, Ali said there was something wrong with the vehicle, pulled over, and lifted up the hood. He then came over to the passenger side of the vehicle and put his hands up A.B.'s dress and tried to put his fingers in her vagina. A.B. resisted and Ali got back in the vehicle. Ali did not go the correct direction to take her home and continued to try to touch A.B. Ali told A.B. that he could rape her if he wanted to. While the vehicle was on the expressway, A.B. looked out the window and mouthed the words "Help me." A.B. then unlocked the door and jumped out of the vehicle into a grassy area. She was injured in the process. Two women stopped to help her. Ali also stopped and tried to get A.B. back in the vehicle but A.B. stayed with the women. Afterwards, Ali made threats towards A.B.'s mother.

{¶13} D.S. testified that Ali assaulted her in 1997, when she was 17 or 18 years old. Prior to the assault, D.S. had helped Ali with a catering job. The day of the assault, Ali asked D.S. and another woman to help with a catering job. They agreed to do so. Sometime later, he came back and said he only needed D.S. Ali took D.S. to the restaurant. He went inside and when he came back out, he told D.S. that the restaurant did not need them. Ali then asked D.S. to go with him to model some clothing for him, which she had done before for him. During the car ride, she smoked a marijuana joint with Ali. Ali took her to a motel. D.S. felt dizzy and weak. She thought the joint may have been laced with something. Ali gave her clothing to put on. D.S. put the clothes on, and Ali began taking photos. However, he also started touching her breasts and vagina. D.S. began crying and asked to go home. Ali called her a "crybaby" but eventually agreed to take her home. They stopped at Subway on the way back and then Ali dropped D.S. a short distance away from the house. Afterwards, Ali tried to intimidate D.S.'s mother. He tried to convince her mother that Ali had not done anything wrong.

{¶14} Detective Gachett with the Akron Police Department testified about his investigation into S.B.'s assault. He indicated that S.B., Ali's great niece, reported that Ali had raped her the day after Thanksgiving 2018. At the time, S.B. was 16. S.B. met Ali the day before the assault when he and S.B.'s mother came over for Thanksgiving. At the time, S.B. lived with her grandparents. Ali was talking to the family about a gym, and the next day, he took S.B., S.B.'s friend, and S.B.'s brother there. Ali then dropped off S.B. at her friend's house and took S.B.'s brother home. S.B. called Ali later to pick her up. Ali picked her up and they went to McDonald's to get something to eat. When they returned to S.B.'s house, S.B.'s brother came out and Ali sent him back inside. Ali locked the car and drove away with S.B. still in the car. They stopped somewhere but Ali said there was too much light, so he drove to another area. That area was close enough to S.B.'s house that she could see the back of her house. Ali tied her up and forcibly had sexual intercourse with

14

her. He took her home and told her that he would take her the next day to a store to buy $100 worth of sex toys. He told S.B. that she was beautiful and that she would look good in black lingerie and red lipstick and that she could be a model. S.B.'s grandmother knew something was wrong when S.B. came home and S.B. reported that Ali tried to touch her. A few days later, S.B. had seizures and was taken to the hospital where she disclosed the nature of the assault. Ali also came over to talk to the grandmother after the assault and denied any misconduct.

{¶15} When Detective Gachett interviewed Ali, Ali indicated that all he did was kiss and hug S.B. and that his DNA would only be on her cheek, neck, and arms. Later, Detective Gachett talked to Ali again. During that interview, Ali indicated that S.B. was the aggressor. Ali stated that S.B. unbuttoned her pants, exposed her breasts, and asked Ali if they were "going to do this or what?" She also took his hand and moved it towards her crotch. Ali told Detective Gachett that he thought about it but did not have sex with S.B. Ali stated that, if anything happened, it was consensual.

{¶16} Following the hearing, the trial court issued an entry concluding that the testimony demonstrated similarities between the prior allegations and the current allegations and that the prior acts could be presented for the purpose of proving a common scheme, plan, motive, intent, and/or absence of mistake.

See Ali, 2021 WL 6143764, at *2-3.  The court then recounted the trial evidence as follows:

{¶17} Evidence was presented at trial supporting the following narrative. S.B. and her brother came to live with her grandmother ("Grandmother") and grandfather ("Grandfather") when she was four years old due to physical and sexual abuse she suffered while living with her mother and father. S.B.'s mother was not supposed to have contact with S.B. and her brother but S.B.'s mother would occasionally come to Grandmother and Grandfather's house. S.B. had a history of mental health issues including bipolar disorder and ADHD.

{¶18} On Thanksgiving 2018, S.B.'s mother and Ali, S.B.'s great uncle, showed up at Grandmother and Grandfather's house unannounced. The children did not know Ali at all. Ali began showing the family pictures of his gym. The next day, while Grandmother was at her brother's house, Ali came over and picked up S.B. and her brother. They also picked up S.B.'s boyfriend on the way. They spent a short time at the gym. Ali drove them to visit relatives and then took S.B. and her boyfriend to her boyfriend's house. Ali next dropped off S.B.'s brother at home. Ali told S.B. that, if she needed a ride home, she could call him. Later, S.B. did call Ali and he picked her up. He drove her to McDonald's and then brought her home. When they reached the driveway, S.B.'s brother came out and Ali told him to go back inside because he did not have socks or shoes on and was wearing shorts and it was cold outside. Ali told S.B. he wanted to show her something and pulled out of the driveway. He drove for a little bit and parked in front of a house but said

15

there were too many streetlights and drove to a street closer to her house and parked there.

{¶19} Ali told S.B. that he gave women massages for money and asked if she wanted a massage. She said no. S.B. testified that Ali started touching her and she froze because she was scared. Ali came over to the passenger side of the car, put the seat back, and got on top of her. Ali pushed up her top and took off her pants and underwear. She indicated that Ali touched her vagina and her breast and that he had her touch between his legs. In addition, S.B. testified that Ali's mouth touched her face and breast. A bruise later developed on S.B.'s breast. A photo of the injury was admitted into evidence. Ali tied her hands behind her back with her underwear, turned her on her stomach and penetrated her butt with his penis. Ali turned her over and put his penis in her mouth. He also penetrated her vagina with his penis. S.B. testified that Ali wore a condom during the assault. When he finished, he told her that he was going to make her his queen and that he would take her to a sex toy shop the next day and let her buy whatever she wanted. Ali then dropped her off at home.

{¶20} When S.B. got home she was scared, confused, and tired. S.B.'s brother testified that she was shaking. Grandmother testified that she knew something was wrong as S.B. appeared upset. S.B. had her head down and Grandmother kept asking her what was wrong. S.B. maintained that she told Grandmother everything that happened, but Grandmother testified that S.B. only told her that Ali touched her.

{¶21} Ali kept calling Grandmother that night and the next day, but Grandmother did not answer. Ali showed up Sunday asking to take the children to a program put on by a pastor. Grandmother said no and told him that S.B. had said that he touched her. Ali told Grandmother that S.B. was probably confused because he hugged and kissed her on the cheek. Then Ali started to cry.

{¶22} S.B. went to school Monday and disclosed the assault to her counselor. She also had a seizure. She was taken to the emergency room but discharged. The next day, S.B. had another seizure and was again taken to the hospital. The seizures were determined to not be true seizures and instead were seizure-like. A physician testified that they were likely due to the stress of S.B.'s childhood and the immediate stress from the events of the prior days. S.B. had never had seizures prior to the assault. While at the hospital, S.B. disclosed the assault. S.B. was then seen by a social worker, Amanda Bright, and a physician. Due to the passage of time, a rape kit was not done. In addition, because of S.B.'s other presenting issues, a vaginal/anal exam was also not done.

{¶23} Ms. Bright's role was to take a history from S.B. to relay it to the doctor and other service providers. Ms. Bright testified that once S.B. started talking, she "provided a very fluid narrative" with "more detail" than typically seen in a first

16

responder interview. S.B. told Ms. Bright that, on November 23, 2018, S.B. was forced to have sex with her great uncle whom she just met. Her great uncle picked S.B. up from her boyfriend's house and drove her to a road that was one street away from her residence. S.B.'s great uncle asked if she wanted a full-body massage and she said no, she wanted to go home. S.B. told Ms. Bright that her great uncle reached over and locked the door and pulled a cloth from the glove compartment. S.B.'s great uncle tied her hands to the headrest. Her great uncle licked, sucked, and kissed on her neck and breasts. S.B.'s great uncle then unbuttoned her pants and pulled them down and started to rub her vagina over her underwear. Then he placed his fingers in S.B.'s vagina. S.B.'s great uncle also began kissing her and put his tongue in her mouth. S.B.'s great uncle then flipped S.B. onto her stomach, squeezed her butt and put his finger into her anus. S.B.'s great uncle removed her hands from the headrest but kept them tied. He pulled down his pants and placed her hands on his penis. Her great uncle then pushed her face onto his penis, but she would not open her mouth. He retied her hands to the headrest and put her on her stomach and began grinding on her butt. S.B.'s great uncle was about to insert his penis into S.B.'s vagina but realized that she was on her period. He said, "I guess we ain't raising no babies today." He then inserted his penis into S.B.'s anus causing her a lot of pain. He removed his penis and inserted his tongue in her anus. S.B. passed out from the pain and woke up to her great uncle kissing her breast and neck. He pulled her underwear and pants up and told her that he would take her to a sex store the next day and let her pick out whatever she wanted for $100. Her great uncle took her home and told her to tell Grandmother that she was at McDonald's. S.B. got out of the car crying and limping in pain. Grandmother asked her what was wrong and S.B. made a partial disclosure. She told a teacher at school on Monday.

{¶24} On December 20, 2018, S.B. presented to the Children At Risk Evaluation Center ("CARE Center") for an interview and examination. Darla Helmick, a social worker, conducted the interview of S.B., which was recorded and also played for the jury. S.B. was initially talkative in the video but after the questioning turned to the events at issue S.B. became quiet and stated that she had already talked about it so many times before. S.B. also started looking down and avoiding eye contact. She denied having consensual sexual activity with anyone. S.B. did ultimately discuss the assault. S.B. described meeting Ali on Thanksgiving and going to the gym earlier in the day on Friday with her brother and her boyfriend. She indicated that Ali had another girl with him she thought was his granddaughter. After the gym, S.B. and her boyfriend were dropped off at her boyfriend's house. Later, S.B. called Ali to pick her up. Ali took her to McDonald's. They went inside to order food but ate in the car. Ali drove S.B. home. When they pulled in the driveway, S.B.'s brother came outside, and Ali told him to go inside because he was not dressed for the cold. Ali locked the car doors and drove away with S.B. still in the car. Ali first stopped in a location he described as being too well lit. He then drove to a street closer to S.B.'s home. Ali told S.B. that he had given two women massages and

17

offered to give her one. She said no and asked him to take her home. Ali tied her hands to the back of the seat, pulled her pants down, and pulled her shirt and bra up over her breasts. He pulled his pants down. Ali sucked and bit her on her left breast causing a bruise. He also sucked on her neck and kissed her. Ali put on a condom and put his penis inside her vagina and then inside her butt. S.B. indicated that it felt like she was "being ripped apart." He tried to put his penis in her mouth, but she tried to bite him, and he slapped her. Ali told her she was a beautiful young lady. He told her she was a queen and a supermodel and that he would take her to a sex toy store the next day and she could pick out whatever she wanted for $100. Ali then drove her home and told her tell anyone that asked that they were at McDonald's talking.

{¶25} S.B. was then examined by a physician. It was a head-to-toe exam including an external exam of genitalia. The doctor did not note any abnormal findings during his exam. S.B. indicated that pain to her anal/genital region from the assault was completely or almost completely resolved. The doctor testified that that area of the body heals quickly and so was not surprised that S.B.'s exam was normal.

{¶26} Detective Gachett from the Akron Police Department was in charge of the investigation. He interviewed Ali twice. In the first shorter interview, Ali admitted only to kissing her on the neck and cheek. The audio recording of the second longer interview was played for the jury. In that interview, Ali claimed that S.B. initiated sex, stating that she put the seat back, raised up her shirt, unbuttoned her pants and asked if they were going to do this. Before she unbuttoned her pants, she took Ali's hand and put it over toward her crotch area. S.B. told Ali that she wanted to know what it felt like. Ali denied having sex with S.B. and said that anything that went on, S.B. initiated it. Ali admitted that he thought for a minute of having sex with her but knew that he could not have sex with his niece. Ali stated that he drove her home when a light came on in a nearby house. Ali thought the allegations came about because Grandmother initiated them, S.B. was covering up that she had sex with someone else, or she thought Ali was going tell others how S.B. behaved. Ali believed that she mistook his statements that he loved her. Ali mentioned that he did ask S.B. if she was sexually active and she said she was not.

{¶27} As part of the investigation, S.B.'s underwear was tested for DNA. First, the underwear was screened for acid phosphatase, which is found in semen, saliva, vaginal secretions, and some bacteria. The test was negative. The crotch, front, and back of the underwear were also swabbed. The swab from the crotch contained no DNA profile foreign to S.B. The back panel swab contained a mixture of DNA; the two major contributors were S.B. and an unknown female. Ali was excluded from those profiles. There was additional male DNA present that was not interpretable. The swab from the front panel included DNA consistent with S.B.'s profile; Ali was excluded from that interpretable data. Additionally, male DNA was found but

18

it was not interpretable. The evidence was forwarded on for Y-STR DNA testing. Y-STR testing is a type of DNA processing that amplifies only male DNA.

{¶28} In the Y-STR testing, Male DNA was detected on the crotch, the front panel, and the back panel; however, the male DNA detected on the crotch and front panel was not suitable for comparison purposes. From the back panel, a mixture of male DNA was detected. Ali was determined to be inconclusive as a contributor due to the mixture on the sample.

{¶29} Both D.S. and A.B. also testified at trial. Prior to their testimony, the trial court informed the jury that it could only consider the evidence for the purpose of deciding whether it proved Ali's motive, scheme, or plan.

{¶30} A.B. testified at trial that Ali was a friend of a family member. While she asserted that she was 15 or 16 at the time of the incident, it was discovered that she was actually 20 years old. In 1994, Ali asked her to model some clothing for him. He picked her up and took her to a house. He started making her feel uncomfortable coming on to her. A.B. asked to go home. Ali proceeded to take her home but started touching her. Ali acted like something was wrong with the van and pulled over. He came around and started touching her. He put his hands up her dress and was trying to put his finger in her vagina. A.B. told him to stop. He got angry and told her that he could rape her. A.B. asked him to just take her home. He started driving again but was headed away from her home. She was scared and began mouthing the word help at cars going by. While they were on the highway, she unlocked the lock on the door and jumped out of the car into a grassy patch. Some women stopped to help her. Ali contacted her mother after the incident.

{¶31} D.S. testified that she was 17 or 18 at the time, but during the testimony it became clear that she was actually 19 at the time of the assault. In 1997, Ali was an acquaintance of hers. She had done some catering work with him in the past. The day of the incident, Ali came over and asked D.S. and another woman to do a catering job with him. They agreed to do so. However, shortly after, Ali said he only needed D.S. Ali picked up D.S. and took her to the restaurant. He went in, and when he came back out, he told D.S. that the restaurant did not need them anymore. Ali then asked her to do some modeling for him. Ali took her to a motel. On the drive to the motel, D.S. smoked a marijuana joint with Ali. It made her feel very sick and lightheaded. At the motel, Ali did take photos of her. However, then he started touching her inappropriately. He was touching her breasts and vagina. D.S. told him she did not feel good and wanted to go home. Ali started being mean and calling her names and threatening her. Finally, he did drop her off a block or two from her house. After the assault, Ali had an altercation with D.S.'s mother about the incident.

{¶32} At the end of the State's case, the trial court commented that it had admitted the Evid. R. 404(B) evidence, in part, because of the expected similarities between

the ages of the witnesses and S.B. Specifically, it was anticipated that the witnesses would be minors and not young adults. The trial court stated that this new evidence did not change its ruling in any way as S.B. and the witnesses were still young women at the time and concluded that there were similarities between the testimony of the witnesses and S.B. The trial court determined that the testimony could be considered for purposes of plan or scheme, absence of mistake, or modus operandi.

{¶33} Ali also testified in his defense. Ali acknowledged going over to Grandmother's house on Thanksgiving and taking the children and S.B.'s boyfriend to see Ali's gym the next day. Ali also admitted to dropping S.B. and S.B.'s boyfriend off at S.B.'s boyfriend's house and later picking S.B. up after she called to ask him to do so. Ali then took S.B. to McDonald's and drove her home. S.B.'s brother came outside without shoes or a coat. At that time, Ali indicated that S.B. said that she was not ready to go inside yet and that she wanted to spend more time with him. Ali told S.B.'s brother that they would be right back and drove off with S.B. Ali stopped at his girlfriend's house to let her know that he was with S.B. and would not be back that night. Ali then drove around awhile and S.B. asked him to pull over. S.B. told him she wanted to stop for a bit. While they were talking, S.B. asked if Ali really loved her and he replied that he did. S.B. then took his hand in hers and pulled it toward her crotch. Ali moved his hand towards her knee. S.B. again asked if he really loved her and he again said yes. S.B. then leaned back in the seat, unbuttoned the top of her pants, pulled up her shirt, and said, "[W]e going to do this or what?" Initially, Ali thought "Why not?" but then thought to himself, "[A]re you crazy?" He knew he was not going to have sex with his great niece. Ali then told S.B. that they could not do that. Then a light came on, and he told S.B. that someone might see them. S.B. then buttoned her pants and put her shirt down and Ali drove S.B. home in silence. Ali told S.B. that she could tell him anything and that what happened between them was between them and no one would ever know.

{¶34} The next day, Ali went over to Grandmother's house because he had been calling but no one answered. Grandmother told Ali that S.B. said Ali "french kissed" her and rubbed her between her legs. Grandmother also told Ali about the children's history of abuse. Ali then proceeded to accuse Grandmother and Grandfather of not protecting the children and treating them like a paycheck. Grandmother told Ali that Grandmother did not know what S.B. would say when she saw her social worker. This angered Ali and he left.

{¶35} Ali denied tying S.B. up and asserted that his car was too small for him to do what S.B. claimed happened in the front seat. Ali maintained that he did not know how S.B. got a bruise on her breast. Ali denied sexually assaulting D.S. He claimed that they were having an affair and when he broke it off, that was when D.S. raised her allegations. Ali, however, admitted that A.B.'s allegations were true. Ali claimed to be taking drugs at the time to stay awake to finish clothing for a

20

fashion show. Ali himself then described A.B. jumping from the vehicle and rolling down a hill. Ali then apologized for what he did to A.B. Ali indicated that he believed that S.B. was coached to make the allegations she did. Ali asserted that S.B. got his name wrong in the CARE Center video and that evidenced that she was coached by someone.

{¶36} On cross-examination, Ali acknowledged that, with respect to A.B., he was convicted of attempted abduction, and, with respect to D.S., he was convicted of one count of kidnapping and one count of rape.

{¶37} In the jury instruction, the trial court provided the jury with a very broad Evid. R. 404(B) instruction which stated that if the jury found the evidence of other crimes to be true, the jury could consider the evidence "only for the purpose of deciding whether it prove[d] defendant's motive, opportunity, intent of purpose, preparation, plan or modus operandi to commit the offenses charged in this trial, or the identity for the person who committed the offense in this trial. This evidence cannot be considered for any other purpose." *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 69-70.

*See Ali*, 2021 WL 6143764, at *3-7.  After recounting the hearing testimony and evidence presented at trial, the court of appeals concluded: "even if the other acts testimony was inadmissible, the admission of that was nevertheless harmless under the circumstances of this particular case." *Id.* at *9.  Thus, the court of appeals overruled the assignment of error. *Id.*  In reaching this determination, the court of appeals explained its findings as follows:

{¶38} On appeal, the State maintains that the evidence was admissible to show absence of mistake or intent. While the trial court referenced absence of mistake as being an acceptable purpose of the evidence during a discussion with the attorneys, the trial court did not instruct the jury that it could be considered for this purpose. As to the other purposes on which the jury was instructed, this Court is very troubled. Some of our concerns follow. We note that the Supreme Court has stated that when identity is not an issue at trial, other acts evidence demonstrating a modus operandi is not admissible. *See id.* at ¶ 37-39. As to evidence of a common scheme or design, the Supreme Court has concluded that the "evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant." *Id.* at ¶ 46. With respect to motive in sexual assault cases, the Supreme Court has stated that "in most cases of this type, there is no motive beyond that implicit in the commission of the offense itself." *Id.* at ¶ 50. Furthermore, "[i]ntent is an element of most crimes, but it typically is not a material issue for other-acts purposes unless it is genuinely disputed—in most cases, the act speaks for itself. Thus, intent evidence is not admissible when the requisite intent is presumed or

21

inferred from proof of the criminal act itself, or when intent is not in issue at all, such as when the defense theory is that the act never occurred." (Internal quotations and citations omitted.) *Id.* at ¶ 55.

{¶39} Nonetheless, even assuming without deciding that the evidence was inadmissible, this Court determines the admission of the evidence was harmless. In determining whether there is harmless error:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Internal citations omitted.) *Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, at ¶ 63. Thus, this Court must consider "the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶33. While Ali attempts to characterize this matter as turning solely on the credibility of S.B. and Ali, we determine there was significant evidence presented which warrants the conclusion that the other acts evidence did not impact the verdict, was harmless beyond a reasonable doubt, and the remaining evidence establishes Ali's guilt beyond a reasonable doubt. *See id.*

{¶40} First, we note that S.B.'s testimony was supported by other evidence. S.B. claimed that Ali bit her breast and there was photographic evidence presented of a significant bruise on her breast taken several days after the assault when she was admitted to the hospital for seizures. Ali had no explanation for how S.B. received that injury. After S.B. was assaulted, both S.B.'s brother and Grandmother noticed something was wrong with her. S.B.'s brother observed that S.B. was shaking when she came home, and Grandmother testified that she knew S.B. was upset. Grandmother described that S.B. was looking down and would not make eye contact. In addition, S.B., who had never had seizures before in her life, days after the assault, began having what was determined to be seizure-like activity. It was believed to be caused by stress.

{¶41} The jury was also able to see S.B. testify at trial and view the video of her interview at the CARE Center. While this Court cannot view her trial testimony, it is evident from the transcript that, at one point during her testimony, she needed to take a break. It appears that there was a concern for S.B.'s well-being at the time because the trial court asked if S.B. was "doing okay." Further, the CARE Center video depicts a quiet teenager who was reluctant to talk about what happened to her. This is at odds with how Ali described S.B. on the day of the assault. Ali incredibly claimed that S.B., his sixteen-year-old great niece came on to him,

22

exposed herself, and basically asked Ali, her uncle who was decades older, to have sex with her.

{¶42} Further, this Court notes that Ali opted to testify in his own defense. During his testimony, Ali spent a fair amount of time discussing his version of the other acts evidence. He testified that D.S. lied and that A.B. told the truth. He also apologized to A.B. and described her rolling down the hill when she jumped out of his vehicle. Accordingly, the other acts evidence did not only come in through the State's case. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 3, 43, 48 ("[W]e conclude that the evidence of the assault on Angelo was harmless and that Cassano's substantial rights were not prejudiced. At trial, Cassano testified that he had been in over one hundred fights in prison and had stabbed four people. Thus, the jury would have known about Cassano's criminal behavior."). Finally, even absent the presentation of other acts testimony, "Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused was convicted of an offense punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 132. "Generally, a prosecutor can cross-examine as to the name of the crime, the time and place of conviction, and sometimes the punishment. However, details such as the victim's name and the aggravating circumstances are not permissible." (Internal quotations and citations omitted.) *Id.* Here, on cross-examination, the State, with no objection from Ali's counsel, asked Ali about the nature of his prior convictions. *See Cassano* at ¶ 48; *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 103. Accordingly, the fact of Ali's convictions connected to the other acts testimony would have been admitted even if the trial court excluded the testimony of the other acts witnesses. Thus, the jury would have learned that Ali was previously convicted of attempted abduction on one occasion and kidnapping and rape on another occasion.

{¶43} Moreover, Ali was not forced to testify. *See State v. Hawn*, 138 Ohio App.3d 449, 468 (2d Dist.2000) (noting that while the defendant's testimony may have been "desirable or necessary" to lessen the impact of the admission of improperly admitted evidence, the testimony "was nevertheless not compelled in the constitutional sense or otherwise derived from the illegality of the improperly admitted evidence[ ]") (Emphasis omitted.). The notion that Ali may have chosen not to testify if the other acts evidence had not been admitted is speculative. *See State v. Turpin*, 2d Dist. Montgomery No. 27064, 2017-Ohio-4200, ¶ 51. The record makes it clear that he made the decision to testify early on in the trial. During opening statements, Ali's counsel told the jury, "[Ali], you will hear from him. There's no question [Ali] will take the stand because he wants to tell his story. He wants to explain exactly what did occur with [S.B.] in the car."

{¶44} "In any case, a defendant faces difficult choices in deciding whether to testify in his own defense." *Id.* "The fact that some or all of the State's evidence might be unrebutted if a defendant does not testify does not amount to compulsion in violation of the Fifth Amendment." *Id.*

*See Ali*, 2021 WL 6143764, at *7-9.

### ii.   Petitioner Has Not Shown Under the AEDPA Standard That the Admission of "Other Acts" Evidence Violated His Due Process Rights

Mr. Ali contends the state court's "ruling was 'unreasonable' and 'contrary' to the Supreme Court's interpretation of federal law," (ECF Doc. 9, p. 2), arguing that "[r]eference to a defendant's criminal record is always highly prejudicial" (*id*. at p. 3).  Because this argument adequately references "clearly established law provid[ing] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair," this Court must consider under the AEDPA standard "whether a fairminded jurist could disagree that the evidence 'so infected the trial with unfairness' as to render the resulting conviction . . . 'a denial of due process.'" *Andrew*, 604 U.S. at 96.  Stated otherwise, the Court must consider whether the admission of the "other acts" evidence was "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Hodge*, 136 F.4th at 661 (quoting *Shinn*, 592 U.S. at 124 (per curiam) (citation and internal quotation marks omitted)).

Having carefully reviewed the state court findings above, the undersigned concludes that Petitioner has failed to show the admission of A.B. and D.S.'s trial testimony regarding alleged assaults in 1994 and 1997 was "so obviously wrong" or "so infected the trial with unfairness" that it rendered the entire trial fundamentally unfair beyond any possibility for fairminded disagreement.  Although the state court indicated it was "very troubled" and had "concerns" regarding the admission of the "other acts" evidence, *see Ali*, 2021 WL 6143764, at *7, ¶ 38, it ultimately found based on a "harmless error" standard articulated by the Ohio Supreme Court that any error caused by the admission of the "other acts" testimony was harmless, explaining:

24

> While Ali attempts to characterize this matter as turning solely on the credibility of S.B. and Ali, we determine there was significant evidence presented which warrants the conclusion that the other acts evidence did not impact the verdict, was harmless beyond a reasonable doubt, and the remaining evidence establishes Ali's guilt beyond a reasonable doubt.

*Id.* at *8, ¶ 39.  In support of this finding, the state court highlighted the following:

- Photographic evidence of a significant bruise on S.B.'s breast, *id.* at ¶ 40;

- S.B.'s brother's observation that she was shaking when she returned home, *id.*;

- S.B.'s grandmother's observation that she seemed upset and was looking down and avoiding eye contact when she returned home, *id.*;

- Evidence that S.B. experienced seizure-like activity believed to be caused by stress in the days after the alleged assault, with no similar activity observed in the past, *id.*;

- A video recording of S.B.'s interview at the CARE Center, where she appeared quiet and reluctant to talk about what happened, at odds with Petitioner's "incredibl[e]" characterization of her behavior (i.e., exposing herself and asking her "decades older" great uncle to have sex with her), *id.* at ¶ 41; and

- Because Petitioner chose to testify in his own defense—an intent his attorney clearly forecasted during opening statements—the Ohio rules of evidence permitted the state to inquire regarding the same prior convictions that were connected to the challenged "other acts" testimony, an inquiry the state made without objection at trial, *id.* at *8-9, ¶¶ 42-43.

Based on the complete trial record, the court of appeals concluded "even if the other acts testimony was inadmissible, the admission of that [evidence] was nevertheless harmless under the circumstances of this particular case." *Id.* at *9, ¶ 45.  Considering the same evidence, the undersigned similarly concludes that Petitioner has failed to demonstrate "beyond any possibility for fairminded disagreement" that the introduction of the "other acts" testimony from A.B. and D.S. so infected Petitioner's trial with unfairness that it deprived him of due process of law.

Petitioner's citation to the dissenting opinion from the state court of appeals does not change this analysis.  (*See* ECF Doc. 1-1, pp. 4-13.)  The dissenting opinion focuses first on the evidence and state law supporting a finding that the trial court erred in admitting the "other acts"

25

evidence, and failed to mitigate that error in its jury instructions.  *Ali*, 2021 WL 6143764, at *10-11, 13, ¶¶ 49-61, 66.  Those findings need not be addressed here, since the majority opinion assumed without deciding that the trial court erred in admitting the evidence.  *Id.* at *8, ¶ 39. The dissenting judge then stated that the majority opinion applied the wrong "harmless error" standard under state law, asserting that the correct standard provided: "'[e]rror in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction.'"  *Id.* at *9, ¶ 47 (quoting *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 177) (brackets in original).)  Under that standard, while acknowledging that "the State certainly did not present a weak case," the dissenting judge explained: "I cannot say that there was 'no reasonable possibility' that the testimony from A.B. and D.S. contributed to Mr. Ali's conviction, or that, after removing that evidence, the remaining evidence was 'overwhelming.'"  *Id.* at *12, ¶¶ 62-63.  For the reasons set forth in Section III.B(1)-(2), *supra*, this Court may not offer an opinion as to which "harmless error" standard is applicable under Ohio state law, and any claim that the majority opinion should have applied a different standard is noncognizable.  Thus, even if the dissenting judge applied the correct "harmless error" standard under Ohio law, this Court may only grant the requested habeas relief if Petitioner meets the more stringent AEDPA standard above.

Mr. Ali's citation to two additional Supreme Court cases also does not impact this Court's analysis.[4]  He cites first to *Michelson*, 335 U.S. 469, arguing that the United States Supreme Court has "ruled that a jury's knowledge of a defendant's past criminal record is

---

[4] Petitioner also cites to other federal and state court cases.  However, it is well-established that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" as required under 28 U.S.C. § 2254(d)(1).  *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012).  Thus, any standards in the cited in federal circuit cases or state cases that are distinct from the established Supreme Court precedent "cannot form the basis for habeas relief under AEDPA."  *Id.*

prejudicial and denies him a 'fair' opportunity to defend against a particular charge." (ECF Doc. 1-1, at p. 2; ECF Doc. 9, p. 2.)  Then he cites to *Boyd v. U.S.*, 116 U.S. 616 (1886), arguing it is "the duty of courts to be watchful for constitutional rights of the citizen, and against any stealthy encroachments thereon." (ECF Doc. 9, p. 7.)  Neither *Michelson* nor *Boyd* stands for the proposition that admission of other acts evidence here amounts to a due process violation.  At issue in *Michelson* was the prosecution's ability to cross-examine a defendant's character witnesses.  335 U.S. at 473.  Additionally, "*Michelson* did not address constitutional issues, but only the pre-Federal Rules of Evidence standard for admitting character evidence." *Love v. Carter*, 49 F. App'x 6, 12 (6th Cir. 2002) (finding reliance on *Michelson* "and its progeny for the proposition that the admission of 'other acts' evidence by a state court may violate the Due Process Clause . . . misplaced").  *Boyd* concerned questions relating to an unreasonable search and seizure within the meaning of the Fourth Amendment and compulsory process forbidden by the Fifth Amendment.  116 U.S. 616.  These cases do not impact the applicable analysis.

As discussed above, the standards applicable under AEDPA require this Court to consider "whether a fairminded jurist could disagree that the [challenged "other acts"] evidence 'so infected the trial with unfairness' as to render the resulting conviction . . . 'a denial of due process.'" *Andrew*, 604 U.S. at 96.  For the reasons discussed above, the undersigned concludes that Petitioner has failed to show that the high standard under AEDPA was met in this case.

### iii. Petitioner Also Has Not Shown Under *Brecht* That the Admission of "Other Acts" Evidence Had a "Substantial and Injurious Effect or Influence" on the Verdict

If this Court agrees with the undersigned that Mr. Ali failed to satisfy the requirements of AEDPA in support of his federal due process claim, it must deny federal habeas relief regardless of how the prejudice standard articulated in *Brecht* may apply.  *See Brown*, 596 U.S. at 133.  The undersigned has nevertheless considered the *Brecht* standard, and concludes that Petitioner also

27

failed to show that the admission of the relevant "other acts" evidence at trial "had a 'substantial and injurious effect or influence' on the verdict." *Id.* at 133 (quoting *Brecht*, 507 U.S. at 637).

Mr. Ali contends: "Without the introduction of 404(B) prior acts evidence, there was not a single piece of evidence that petitioner Ali had committed a crime." (ECF Doc. 9, p. 2.) However, as discussed above, the evidence presented at trial included: photographic evidence of significant bruising; the observations of two third parties that S.B. was shaking, upset, and avoiding eye contact when she returned from the alleged assault; evidence that S.B. suffered the new onset of seizure-like behavior only days after the alleged assault; trial testimony from S.B.; and a video-recorded interview of S.B. where her demeanor was observed by the court of appeals to be at odds with Mr. Ali's characterization of events, in which he asserted that a 16-year-old girl exposed herself to her decades-older great uncle and asked him to have sex with her. Having considered the trial record as a whole, the undersigned concludes that Mr. Ali has not met his burden to show that the admission of the "other acts" testimony had a "'substantial and injurious effect or influence' on the verdict." *Brown*, 596 U.S. at 133 (citing *Brecht*, 507 U.S. at 637).

For all of the reasons set forth above, the undersigned concludes that Mr. Ali has failed to show under AEDPA that no "fairminded jurist could disagree" that the admission of other acts evidence at his trial "'so infected the trial with unfairness' as to render the resulting conviction . . . 'a denial of due process,'" *Andrew*, 604 U.S. at 96, and has failed to show under *Brecht* that the admission of the evidence had a "'substantial and injurious effect or influence' on the verdict." *Brown*, 596 U.S. at 133 (quoting *Brecht*, 507 U.S. at 637). Accordingly, to the extent that Ground One asserts a federal claim that is cognizable on federal habeas review, the undersigned recommends that the Court **DENY** Ground One on its merits.

## IV.     Recommendation

For the reasons set forth herein, the undersigned recommends that the Court **DISMISS**

and/or **DENY** Ground One, the sole claim for relief in the Petition.


April 14, 2026


                                        */s/ Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        UNITED STATES MAGISTRATE JUDGE



## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).